The other facts in the cause will sufficiently appear in the following opinions. In the supreme court, the following opinion was delivered by Mr. Justice Marvin, in the case in which Ransom S. Smith was defendant; and the other causes were decided in accordance with it:
Marvin, J.
The act to authorize the business of banking, passed April 18, 1838, does not attempt to prescribe the steps to be taken in order to bring into existence the bank, or legal being, which is to possess the power specified in the act. It speaks, however, of articles of association in several places. The 16th section provides for the evidence of the organization. It is to be a certificate under the hands and seals of the persons associated. This certificate is to be proved or acknowledged. It is to be recorded in the county clerk’s office, and a copy is to be filed in the office of the secretary of state. Until the certificate required by the sixteenth section is made, no legal being of the associates, known by the name designated in the articles, exists; and as the statute requires those persons who associate to make this certificate, those who do not unite in it are not members of the association. It has been held, that those who subscribed *556 the first articles of association, and agreed to take stock in, the Farmers’ Bank of Orleans, but refused to unite in the certificate of the twenty-second September, were not bound by their subscription, and that the receiver could not enforce payment. It is not necessary in this case to express an opinion upon that question. I remark, however, that the articles of association do not contain any express promise to pay. They contain rules in relation to the subscription for stock, and also for the government of the institution.
The “ deeds of settlement,” under which joint stock companies and banks are organized in England, are instruments inter partes. The parties to the instrument are the trustees, the directors or managers, and the shareholders. And iit contains a variety of covenants. The subscribers for shares covenant with the trustees to pay the amounts which they, subscribe, and they may be sued in the name of the trustees upon their express covenant. (Wordsworth on Joint Stock Companies, 85, 86, 316.). ' Our act to authorize the business of banking follows closely many of the provisions of the English acts in relation to joint stock companies. But, as already remarked, it does not specify any preliminary steps to be taken. It does not require any articles of association, nor does it require any subscription for stock. It provides for the evidence of organization, and requires that the persons associated shall, under their hands and seals, make a certificate specifying the name of the association, its place of business, the amount of its capital stock, the name and residence of the stockholders, and the number of shares held by each of them respectively, the period for the commencement and termination of the association. This certificate is to be proved and recorded, and then it may be used as evidence for and against the association. It would seem that no person could be a stockholder at the time of the organization, unless he united in this certificate. Those who'unite become the associates, and the legal being, upon which the *557 powers, duties and liabilities specified in the act are conferred, springs into existence.
Those who do not unite in this certificate, are not at that time members of the association. They may become so by a purchase of stock. But it is clear that a person who had bound himself to take stock, would not be liable in an action by the bank upon his agreement. In Stanton, President of Albany Exchange Bank, v. Wilson (2 Hill, 153), which was an action to recover the amount of a stock subscription in the name of the president of the bank, after its organization, it does not appear whether Wilson had signed the certificate required by the 16th section of the act. In that case, there was an express engagement in writing to pay to the directors, or such person or persons as they should appoint, &c. I do not think it necessary, in this case, to express an opinion upon this question. It is clear, from all the evidence in this case, that the defendant Smith never subscribed for stock at any time, except on the third day of June, when he subscribed for forty shares, payable in a bond and mortgage, under the circumstances disclosed in the evidence. This position is clear from the evidence adduced by the plaintiff. The plaintiff does not seek to recover this subscription. On the contrary, he disavows it, or, in other words, he claims that, by some agreement between the defendant and the commissioners or other officers of the association, the defendant increased the amount of his subscription for stock to $3,500, being seventy shares, and agreed to take, and did take and hold in said association, stock to that amount; and the plaintiff claims a decree for this amount as so much subscribed for by the defendant, in case the bond and mortgage shall be held to be invalid in his hands.
Can the plaintiff, under these allegations in his bill, recover upon any subscription, unless he establishes one for seventy shares ? Can he resort to the subscription for forty shares, after having stated that that was abandoned and a subscription for seventy shares substituted? It seems to me that he *558 cannot. The decree must be in accordance with the allegations and proofs of the parties, and it must be consistent with the case made by the bill. The bill in effect declares that the agreement to take forty shares of stock was at an end; that it had ceased to be binding upon the parties; that they had made another agreement. And this latter agreement stated in the bill is the one which the plaintiff seeks to enforce. He must establish this agreement, or fail upon this part of his case. I think we may, therefore, dismiss the question of the liability of the defendant upon his subscription for the forty shares. It is proper, however, to keep in mind the circumstances under which that subscription was made, and the subsequent acts of the parties, with a view of ascertaining whether the defendant became bound in any subsequent part of the history of the case. I think the evidence fairly shows that when the commissioners applied to Smith to subscribe for stock, he informed them that his land was incumbered, and that he could not take stock, and they gave him assurances that the bank would furnish him money to pay off his incumbrances, so that his mortgage could be received in payment for stock. Some of the evidence goes further, and shows that Smith subscribed upon the condition that the bank should furnish money to pay off previous incumbrances. I do not think it very material to inquire as to the precise language used on that occasion. It is clear to my mind that Smith was induced to subscribe from the representation that he should have money to pay off previous incumbrances before he should be called upon to pay his subscription in a bond and mortgage, and that he relied solely upon that source for money to pay off the incumbrance.
When he was applied to, on the thirty-first day of July, at his residence, by two of the directors and Mr. Buggies (who was present when he subscribed), for his bond and mortgage, he at first declined to give them, alleging that his land was incumbered, and that the1 bank was to furnish *559 the means of paying off the incumbrances. He was prevailed upon to execute the bond and mortgage at that time, as a matter of convenience to the persons then engaged in taking bonds and mortgages; and the amount for which they were given was $3,500, equivalent to seventy shares. .Smith’s land was not at that time appraised, and it was suggested that the bond and mortgage should be made for that sum; and in case the appraisal should not warrant that amount of stock, they should be indorsed down, and he should have such an amount as they would warrant. They were accordingly made and delivered to the attorney conditionally, not to be used until other things were done. The land was to be appraised, and money was to be furnished by the bank to pay off the incumbrances. They were not taken in satisfaction of the subscription for forty shares. That seems to have been waived and disregarded. There is no necessary connection between them.
At this stage of the case, no one would contend that the bank would be bound to issue seventy shares of stock to the defendant, and take the bond and mortgage upon incumbered lands. The bank would not take the bond and mortgage absolutely as payment for so-much stock, without an appraisal. Here, then, was no absolute delivery of the bond and mortgage; and unless they were subsequently delivered to the bank by the defendant, or with his consent, and accepted absolutely by the bank, they cannot be enforced.
The circumstances under which the bank became possessed of them a long time after it commenced business, are clearly stated in the evidence. And I do not understand that it is alleged that the defendant directed or consented to their delivery. They were handed, with some other bonds and mortgages, in September, 1841, to the president of the bank, by an individual who had been appointed one of the appraisers, &c., of the lands mortgaged. The land of Smith had never been appraised. The receiver found this bond and the mortgage in the bank. Nothing had been done with 1
*560 It is now claimed that the act of Smith, in making the certificate of the twenty-second September, was a waiver of any conditions attached to the delivery, and that it was equivalent to a delivery; or, if not, that he is estopped from alleging that he was not a stockholder for seventy shares. The certificate made by the directors on the twenty-third day of July was supposed by them to be sufficient, but they learned, early in August, that it was not according to the 16th section of the act; and a meeting of the stockholders. was called for twenty-second September.
The notice for this meeting was published. It did not indicate the object of the meeting. At that meeting, the attorney who had prepared the papers and taken the bonds and mortgages, and was acting as the agent of those who were attempting to organize the bank, presented the certificate for signatures. He stated the certificate that had been filed was wrong, and it t was necessary to have the one he presented. Some objections were made to signing it; and he told them it would make no difference, that their rights and privileges would not be affected by it.
The defendants, with others, signed and acknowledged the certificate, by'which he declared that he was a stockholder to the amount of seventy shares. This certificate after stating that the subscribers have associated themselves under the act to authorize the business of banking, certifies the name of the association, its place of business, the amount of the capital stock, its commencement and termination, and concludes'; “In testimony whereof, we have hereunder written our names, and affixed our seals, at, &c., the 22d day of September, 1838, and have placed opposite our names, the place of residence of each of us, and the number of shares of capital stock that we severally hold.” Opposite the name of the defendant, under the heading “ Shares,” is written “ 70.”
Is this certificate evidence of the delivery of the bond and mortgage ? If the land had been appraised at a sum suffi *561 cient to entitle the defendant to seventy shares, and the previous incumbrance had been removed, a strong presumption might from this act be raised in favor of a delivery in law. But all the facts in the case are against such presumption. The incumbrance had not been removed, the land had not been appraised, and there is no evidence to show any new agreement by which the associates or the bank, agreed to take the bond and mortgage, and give the defendant seventy shares of stock. No reference is made in this certificate to any bond and mortgage, it is a simple declaration that the defendant holds seventy shares of stock. It does not, in my judgment, prove any delivery of the bond and mortgage, even prima fade, much less does it contain upon this point, that species of evidence which concludes the party.
If this act was a delivery, then there was an acceptance on the part of the bank, and the defendant would have been entitled to demand and receive the seventy shares of stock. The bank never so understood this obligation. We are to suppose that they understood the arrangement under which the mortgage was executed. But it is insisted by the plaintiff’s counsel that although the bond and mortgage may be invalid in the hands of the plaintiff, still the defendant is liable as upon a subscription for seventy shares, and that having United in the certificate, he is now concluded from showing that he did not subscribe. An estoppel, says Lord Coke, is when a man is concluded by his own act to say the truth. As estoppels exclude the truth, they are not favored. They are required to be certain, and they are never carried beyond the plain language of the record, or instrument resorted to, by the party setting them up.
But suppose the defendant is estopped from denying any and all the facts stated in the certificate, does that contain facts enough to entitle the plaintiff to recover? What facts bearing upon the question of liability made by the bill, are established? The certificate does not contain any agreement, any promise to pay. It contains no declaration that *562 the defendant had ever subscribed for stock. It simply declares him one of the associates, and that he holds seventy shares of stock; and it is claimed that this is conclusive proof that he subscribed for seventy shares. The position must go to that extent, or it will not sustain the case made by the bill. The claim is there founded upon a subscription. Besides, the certificate does not contain any promise or undertaking, and the plaintiff found it necessary not only to state in his bill a subscription, but to give all the proof upon the question that in reality existed. No inference can be drawn from the certificate beyond its language, which may not be rebutted.
The certificate declares then that he holds stock. How be acquired it does not appear from the certificate. It would be entirely consistent with the certificate, if it should appear that he purchased the stock the day before. There is nothing in the act to prevent the issuing of stock, previous to the making of the certificate. Indeed, the fourth subdivision of § 16, seems to contemplate the issuing of the stock before the certificate is made. It will hardly be insisted that the plaintiff could recover upon simply proving the certificate of the twenty-second September. He must prove something else, he is driven to make other proof, and the case is open to all proofs and explanations, which do not violate the great leading rule of evidence, that parol evidence cannot generally be received to contradict, alter or explain written evidence. The case is not, I think, embarrassed with the principle of estoppels. The defendant was then at perfect liberty to show that he did not subscribe for seventy shares. Indeed, it was necessary that the plaintiff should show that he did subscribe, or agree to take the seventy shares. The proof of the plaintiff shows as clearly as a negative can well be shown, that no such subscription was ever made.
The bill is framed with a double aspect: first to enforce payment of the bond and mortgage. Secondly, in case they should be declared invalid, then the plaintiff asks for a der *563 cree to enforce the payment of $3,500, due from him on his subscription for the seventy shares of stock. It is claimed that this remedy is given in a court of equity, by 2 R. 8., 490, § 69. Before the receiver can avail himself of this section, lie must show a subscription for stock. He lias failed to do so. The certificate of the twenty-second September does not prove it. He does not seek to recover for the forty shares, and if he did I do not think under the circumstances in this case, that he could succeed.
I might stop here, having, as I think, shown that the bond and mortgage are not valid obligations in the hands of the receiver, as they were never delivered, that the bill is not for the collection of the subscription for the forty shares, and that the certificate of the twenty-second September does not prove conclusively that the defendant ever subscribed for stock. But it is proper to add, that it appears in this case, that the bank has paid all its debts, and that the stockholders only are interested in a recovery in this suit. They must be bound by the acts of their agents. And it clearly appears that the bank did not regard the defendant as a stockholder. No stock was ever issued to him. He was distinctly told, a year or two after the bank commenced business, that he was not a stockholder. No dividends were declared in his favor, nor was he ever required to pay interest upon his mortgage. It appears to have been understood that something more was to be done before he could be a stockholder.
The controversy is between him and his associates, and they had repudiated all the preliminary undertakings, and had excluded him from any participation in the affairs of the bank. They did not claim him as an associate, and I see no objection as between these parties to showing these facts.
The public, other than the associates, have no interest in the matter. As among themselves they only are bound by their agreements. (Wordsworth on Joint Slock Companies, 85, 86, 260, 261, 262, 316, 317, 31S.)
*564 The only express agreement which, the defendant made, was at the time he subscribed for the forty shares, and that was an agreement to pay in a bond and mortgage. If the plaintiff sought to enforce this agreement, I submit that the bill would be in the nature of a bill for a specific performance.
A specific, performance cannot be decreed consistently with the rules of equity. The defendant cannot now have stock. It is not a matter of course to decree a specific performance. There must be equity in the plaintiff’s case, and after having repudiated for years all the arrangements with the defendant, and denied him the rights of a stockholder; the associates, by their receiver, who represents them, cannot now be permitted to come in and claim the defendant as -a stockholder or partner. They are concluded by their acts. I think the decree of the vice-chancellor should be affirmed.
Judgment being entered in the several causes in accordance with this opinion, the plaintiff brought this appeal.
H. R. Selden, for the appellant.
N. Ranis, Jr., for the respondent.
Taggart, J.
I have, in my examination of these cases, endeavored to consolidate the facts together, with my views of them, into a single cause, instead of examining each by itself. There are some slight differences in the facts of the cases, but not sufficient to affect in any degree the merits.
Section 15 of the general banking law, passed in 1838, authorizes any number of persons to associate to establish offices of discount, deposit and circulation, upon the terms and conditions, and subject to the liabilities prescribed in said act; but the actual capital of such association must not be less than $100,000.
Section 16, requires the associates, under their hands and seals, to make a certificate which shall specify: 1st, the *565 name of the association; 2d, the place where the operations of discount and deposit are to be carried on; 3d, the amount of capital stock of the association, and the number of shares in which it shall be divided; 4th, the names and places of residence of the shareholders, and the number of shares held by each of them, respectively; 5th, the period when such association shall commence and terminate; which certificate shall be proved or acknowledged and recorded in the office of the clerk of the county where any office of such association shall be established, and a copy thereof filed in the office of the secretary of state. Until the certificate required by the % 16, is made, there is no legal institution existing, and those who did not unite in the certificate of the 22d of September, are not members of the association. But it is unnecessary to discuss this branch of the case, as our opinion and decision in these cases are placed on other grounds.
There was no absolute delivery of the bonds and mortgages. It was distinctly understood that mortgages on incumbered lands could not be received as payment for the stock. The bonds and mortgages were left with Buggies, but not to be used unless the incumbrances were removed. (Clark v. Gifford, 10 Wend., 310; Gilbert v. The North American Fire Insurance Company, 20 Wend., 43; Johnson v. Baker, 4 Barn, and Ald., 440.) These cases show, that the mortgages in question were delivered conditionally, and not absolutely.
Besides, those mortgages were never treated as delivered, or as belonging to the bank. They were not received in payment of stock, either absolutely, in full, or in part. The defendants were not treated as stockholders by the bank in any way. The suit to foreclose the mortgages cannot therefore be sustained.
The question then arises on the liability of the defendants to pay for the stock subscribed by them. Are they legally subscribers for stock and liable to pay therefor ? They signed *566 the original articles for the number of shares affixed to their names respectively. The bank, however, was never organized under these articles, but was in reality organized without reference to them. There can be no good reason for holding the defendants, or either of them, upon the articles signed in June. Those articles were never in any manner carried out, but were substantially abandoned. The only plausible ground for charging the defendants, is, upon the certificate of September 22, 1838.
A corporation may maintain an action at law against a subscriber to the stock of the company for his unpaid subscription. (Goshen and Minisink Turnpike Company v. Horton, 9 J. R., 217; The Dutchess Cotton Manufacturing Company v. Davis, 14 J. R., 238; Spear v. Crawford, 14 Wend., 20.) In all those cases there was a promise to pay for the stock. In the present cases there is no such promise. But admit that no express promise is necessary, what is the situation of these parties? The defendants acknowledged themselves to be stockholders when in fact they were not such. They agree to take stock and pay for it, but do they agree to pay for the stock with the,absolute certainty that they cannot have it? Do they agree to pay for what they neither have nor can have? They have never been regarded, or treated as the owners of the stock while the bank had the power of allotting stock to them. It has never been either allotted or offered to them.
We think the language of the vice-chanceller, in his opinion in the case against Smith, is very appropriate, viz.: “I believe it will be conceded as sound, both in morality and equity, that the corporation which grew out of their actions should not have the benefit of a subscription unless they performed the condition upon which the subscription was obtained even though those who made the promise were not agents of the corporation,” citing Edwards v. Grand Junction Railway Company (7 Simons, 337); Same v. Same (1 Milne § Craig, 650).
*567 We are willing to go still further than" the vice-chancellor. We believe it sound both in morality and equity that the corporation should not have the benefit of these subscriptions unless they can perform the obligations on their part to allot the stock which was to be the fruit of such subscriptions. This they have not done, nor the power to do.
The language of Mr. Justice Marvin in delivering the opinion of the supreme court in the same case, is perhaps still more appropriate, viz.: “There must be equity in the plaintiff’s case, and after having repudiated for years all the arrangements with the defendants and denied them the rights of stockholders, the associates, by their receiver who represents them, cannot now be permitted to come in and claim the defendants as stockholders, or partners. They are concluded by their acts.”
The judgment of the supreme court must therefore be affirmed.
Ruggles, Ch. J., Johnson, Morse, Jewett and Willard, Js., concurred in the foregoing opinion.
Mason, J., gave no opinion.
Gardiner, J., having been counsel in the court below, did not sit in these cases.
Judgment affirmed.